ORIGINAL

JOHNSON BOTTINI, LLP
FRANK J. JOHNSON Cal Bar No. 174882
FRANCIS A. BOTTINI, JR. Cal. Bar No. 175783
DEREK J. WILSON, Cal. Bar No. 250309
655 West Broadway, Suite 1400
San Diego, California 92101
Telephone: 619/230-0063
Facsimile: 619/233-5535

Attorneys for Plaintiff

FILED
APR 30 2009
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kenneth Heilbrunn, Mark Hamlin, and Bruce Jedziniak, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SEQUENOM, INCORPORATED, HARRY STYLLI, AND PAUL HAWRAN,<br><br>Defendants. | No. '09 CV 0922 WQH CAB<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs, individually, and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Sequenom, Inc.,("Sequenom" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Sequenom; and (c) review of other publicly available information concerning the Company.

**NATURE OF THE ACTION**

1. This is a securities class action on behalf of all persons of who purchased or otherwise acquired Sequenom securities between June 4, 2008 and April 29, 2009, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As detailed below, during the Class Period the defendants issued false and misleading statements to the public in press releases, analyst conference calls, and filings with the U.S. Securities and Exchange Commission ("SEC").

2. On April 29, 2009, after the market closed, Sequenom issued a press release stating that its employees had mishandled the tests results and data for its "crown jewel" – the SEQureDx test which was being developed as a non-invasive prenatal test for Down Syndrome . As a result, the Company disclosed that commercial launch of the test would be delayed. The Company also:

(a) suspended four employees;

(b) formed a Special Committee of the Company's Board of Directors to investigate wrongdoing;

(c) stated that the Company's previous press releases and public SEC filings concerning SEQureDx could no longer be relied upon;

(d) stated that, due to these developments, the Company is now reviewing the test results for ***all*** its products, not just SEQureDx;

3. The stock market and analysts who follow Sequenom reacted immediately to these shocking disclosures. Sequenom's stock market price was decimated by over 80% within hours, and analysts quickly downgraded Sequenom to a "sell" and stated that is is now questionable whether Sequenom will ever be able to derive any revenue from SEQureDx. "I don't believe the product will ever launch," Brean Murray Carret and Co analyst Jonathan Aschoff said.

"***We seriously doubt that a timeline can be put forth when all of the RNA and DNA data generated to date is now questionable***," he added.

Aschoff said although the company plans to launch the test upon publication of ongoing trial results in a peer-reviewed journal, he finds it "***almost impossible to have faith in those results given the recent developments***."

Collins Stewart analyst Keay Nakae said, with data from the company's research and development laboratory losing their value, there would be lesser interest in participating in the company's clinical studies.

***Any review will now be subject to a higher level of scrutiny and therefore will be more thorough and take longer to be signed off on before it can be published,*** Nakae added.

"***We believe that under the most optimistic scenario, the test would not be launched until 2011," he said, downgrading the stock to "sell.***" Brean Murray's Aschoff, who called the Down Syndrome test ***the company's "crown jewel***," does not think Thursday's sell off was overdone.

4. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337, and 1367 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

6. This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C.

§1391(b) and (c). Sequenom is headquartered in San Diego and substantial acts in furtherance of the alleged fraud and/or its effects occurred within this District.

7. In connection with the acts and omissions alleged in this complaint, defendants directly or indirectly used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

8. Plaintiffs, as set forth in the accompanying certifications incorporated by reference herein, purchased Sequenom securities and have been damaged thereby.

9. Defendant Sequenom is a Delaware corporation with its principal executive offices located at 3595 John Hopkins Court, San Diego, CA 92121.

10. Defendant Harry Stylli ("Stylli") was, at all relevant times, President and Chief Executive Officer ("CEO") of Sequenom and a director of the Company since June 2005.

11. Defendant Paul Hawran ("Hawran") was, at all relevant times, Chief Financial Officer of the Company, and has been since April 1, 2007.

12. Defendants Stylli and Hawran are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, as well as control the Company's other public statements, including press releases and presentations to securities analysts, money and portfolio managers and institutional investors. Each defendant was provided with copies of the Company's report and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the defendants knew that the adverse facts specified herein had not been

disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

**SUBSTANTIVE ALLEGATIONS**

13. Sequenom is a corporation which develops genetic analysis products that translate genomic science into solutions for biomedical research, agricultural applications, molecular medicine and non-invasive prenatal diagnostics research, and potentially, clinical utility. The Company's proprietary MassARRAY® system is a high-performance DNA analysis platform that efficiently and precisely measures the amount of genetic target material and variations therein. The system is able to deliver reliable and specific data from complex biological samples and from genetic target material that is only available in trace amounts. The Company has exclusively licensed intellectual property rights for the development and commercialization of non-invasive prenatal genetic tests for use with the MassARRAY® system and other platforms. The Company's corporate offices are located in San Diego, California.

14. On June 4, 2008, Sequenom issued the following press release:

> SAN DIEGO--(BUSINESS WIRE)--June 4, 2008--Sequenom, Inc. (NASDAQ:SQNM), a leading provider of genetic-analysis solutions, announced positive results from screening studies using the Company's noninvasive circulating cell-free fetal (ccff) nucleic acid SEQureDx(TM) Technology, which enables the detection of fetal aneuploidy, including Down syndrome from maternal blood. At its analyst-and-investor briefing "The Future of Noninvasive Prenatal Diagnostics" held at the International Society of Prenatal Diagnostics (ISPD) conference in Vancouver, Canada, executives were joined by a panel of leading scientists and clinicians to discuss study results and updates in the development of noninvasive prenatal diagnostics.
>
> ***The Company reported that in blinded studies performed at Sequenom involving approximately 200 clinical samples collected both prospectively and retrospectively, its proprietary test for Down syndrome correctly identified 100% of all Down syndrome samples (i.e. sensitivity or detection rate), without any false-positive outcomes (i.e. specificity). Population coverage for the T21 test improved to at least***

***93% of the U.S. population. With currently available serum-testing options having detection rates between 70% to 90% and false-positive rates as high as 5%, SEQureDx Technology shows promise for significant performance advantages over the current paradigms for prenatal screening.*** The Company expects to continue its development activities through the end of 2008, at which time the Company will initiate transfer of the technology to laboratory partners. The Company plans to initiate a multi-site validation study consisting of several thousand samples in the fourth quarter this year and launch its Down syndrome test as a Laboratory Developed Test (LDT) in the U.S. in the first half 2009.

***"We are very pleased to be reporting substantial progress toward commercializing an important test to screen for Down syndrome*** that can be administered as early as late in the first trimester through a simple blood draw from the mother," said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer. "Data from our blinded screening study for the detection of fetal aneuploidy indicate that the current version of our test has identified all Down syndrome samples without any false-positive outcomes. Also our coverage has improved to at least 93% of the U.S. population. Although these results require further validation in larger studies, such results using SEQureDxTM Technology can potentially transform current clinical practice for Down syndrome-risk assessment."

The studies conducted both prospectively and retrospectively, involved approximately 200 samples in both normal and high-risk patients. The blinded-prospective study involved 180 samples comprising 130 low-risk and 50 high-risk samples. The test correctly identified three Down syndrome samples without any false-positive outcomes. Of the 21 blinded samples analyzed retrospectively, the test correctly identified seven Down syndrome samples while also indicating no false-positive results.

"A direct, noninvasive genetic assessment of fetal Down syndrome will result in far-better screening accuracy and would dramatically reduce the number of unnecessary, invasive diagnostic procedures that women undergo in current maternal serum-screening protocols. Improved detection rates, as reported by Sequenom in its assay optimization studies, exceed those with currently available screening models," said Allan T. Bombard, M.D., a reproductive geneticist with more than two decades of experience in the field of prenatal screening and diagnosis. (Dr. Bombard serves as a Chief Medical Director at Sharp Mary Birch Hospital and is the Principal Investigator of the study.) "Moreover, having minimum false-positive results will significantly reduce the number of unnecessary confirmatory diagnostic tests, as well as the anxiety and complications associated with invasive procedures."

Currently available tests conducted during the first or second trimester of pregnancy use epigenetic markers associated with the Down syndrome phenotype that are characterized as "surrogate" markers as they are not directly related to the extra Number 21 chromosome. Different combinations of markers, measured at different times in pregnancy, constitute the multiple-marker approach to screening. These tests have detection rates of 70% to 90% with approximately a 5% false-positive rate,

while also having inconsistent population coverage or ethnicity rates. The SEQureDx test uses a maternal blood sample drawn as early as the first trimester and identifies directly the extra Number 21 chromosome. Invasive procedures such as amniocentesis or chorionic villus sampling (CVS) carry risk of miscarriage and other risks to mother and fetus.

"Current screening methods, using multiple 'surrogate' markers, are very good, but are unlikely to reach diagnostic potential," said Jacob Canick, Ph.D., Professor of Pathology and Laboratory Medicine at Brown University Medical School. "In contrast, I am optimistic that tests using multiple-fetal RNA and DNA markers can be developed not only for Down syndrome, but for all clinically important aneuploidies, and it is reasonable to expect that such direct, noninvasive diagnostics could be done in the first trimester of pregnancy."

Sequenom's analyst-and-investor-briefing event speakers included Alan Bombard, M.D., Chief Medical Officer at Sharp Mary Birch Hospital, who discussed current clinical practices for Down syndrome screening and diagnosis; Jacob Canick, Ph.D., Professor of Pathology and Laboratory Medicine at Brown University Medical School, who discussed methods for screening pregnancies for Down syndrome; Professor Dennis Lo, consultant to Sequenom and a leading researcher in prenatal diagnostics, who discussed the future of prenatal diagnosis; and Sequenom's Senior Vice President of Research and Development Elizabeth Dragon, Ph.D., who reviewed progress with Sequenom's SEQureDx Technology in developing a test for Down syndrome. A webcast of the event is available on the Company Web site at www.sequenom.com.

Sequenom's Proprietary Noninvasive Prenatal Diagnostics

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY platform.

About SEQureDx Technology

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike

current standards of harvesting placental tissue cells as is required for chorionic villus, or entering the uterus to sample the amniotic fluid surrounding the baby as is performed with amniocentesis, SEQureDx Technology extracts Fetal Nucleic Acid material safely and comfortably from a simple blood specimen collected from the mother to determine the genetic status of the fetus. This breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In December 2007, the Company, through its laboratory partner, introduced a laboratory-developed RhD incompatibility test using RT-PCR in the United States. In February 2008, Sequenom announced progress with its noninvasive Trisomy 21 test based on multiple RNA fetal markers, including the PLAC4 gene as previously published by Dr. Dennis Lo, Chinese Hong Kong University. In these preliminary studies, data from more than 100 clinical plasma specimens of various ethnicities indicated that the development-stage Trisomy 21 test was approaching 85% (+/- 5%) ethnic coverage, more than 95% sensitivity and close to 99% specificity."

15. On or about June 26, 2008, the Company priced its Secondary Offering. The Company announced that 5,500,000 shares would be sold to the public at $15.50 per share and that underwriters had a 30-day option to purchase up to an additional 825,000 shares of common stock to cover over-allotments. The price was near the 52-week high for the Company's stock. The Offering was a financial success for the Company, as it was able to raise net proceeds of over $85 million by selling approximately 5.5 million shares of stock to the public at a price of $15.50 per share.

16. In connection with the Offering, the Company filed a Registration Statement and Prospectus on June 23, 2008, as supplemented on June 26, 2008 (collectively referred to herein as the "Registration Statement") with the SEC.

17. The Registration Statement contained untrue statements of material fact, omitted other facts necessary to make the statements made therein not misleading, and was not prepared in accordance with applicable SEC rules and regulations. Specifically, the Registration Statement stated

"Our research and development efforts in molecular diagnostic products are focused on the development of non-invasive diagnostics (SEQureDx) for use on the MassARRAY system and other platforms. Initially, we are focused on providing this technology, which is non-invasive using a simple maternal blood draw, for prenatal diagnostics. Our other diagnostic tests are also planned to be non-invasive and are expected to use simple blood draws from patients rather than invasive procedures

such as surgery. ***We plan to initially commercialize this technology through laboratory partners in the form of Laboratory Developed Tests, or LDTs***, also known as "Home Brews," which is the predominant approach used for current tests such as serum screening and invasive prenatal tests. In addition, following acquisition or build-out, ***we plan to commercialize this technology through our own CLIA*** (Clinical Laboratory Improvement Amendments, 1988) licensed laboratory. Concurrent with our LDT commercialization and revenue building activities, we plan to conduct the development activities necessary to file submissions with the Food and Drug Administration, or FDA, seeking approval for selected diagnostic tests.

In December 2007, through a laboratory partner we launched a LDT for Rhesus D, or RHD, genotyping. ***During the third quarter of 2008, we plan to launch, through various laboratory partners, additional tests using our MassARRAY platform*** for RHD genotyping and sex determination for detection of x-linked disorders.

"We are also developing a test for Trisomy 21 (Down syndrome). We plan to initially commercialize the test as a LDT through laboratory partners in the first half of 2009, and then through our CLIA laboratory following acquisition or build-out. We are also expecting to conduct various development efforts to provide a FDA submission seeking approval of the test in 2011. In addition to Trisomy 21, we plan to develop other chromosomal tests, including tests for Trisomy 18 (Edwards syndrome) and Trisomy 13 (Patau syndrome)."

18. The Registration Statement also incorporated Sequenom's historical financial information. The Registration Statement referred Sequenom shareholders to "our unaudited consolidated financial statements for the three month periods ended March 31, 2008 and 2007, and as of March 31, 2008, all of which are incorporated by reference into this prospectus."

19. The statements contained in the Registration Statements were false and misleading because the Company failed to disclose that the clinical tests concerning SEQureDx were not being conducted properly, that SEQureDx did not offer statistically significant improvement over competing tests, and that due to problems with the clinical tests it was not feasible that Sequenom would be able to bring its new test to the market in 2009. The Company also failed to disclose that the Company was mishandling test data and results for the SEQureDx Down syndrome test.

20. On September 23, 2008, Defendants prepared and disseminated a press release from San Diego entitled "Sequenom Announces Additional, Positive Results for Down Syndrome Test at Analyst Briefing." The press release stated:

> "SAN DIEGO & NEW YORK--(BUSINESS WIRE)--Sept. 23, 2008--Sequenom, Inc. (NASDAQ:SQNM), a leading provider of genetic-analysis and molecular diagnostic solutions, ***announced additional, positive results from screening studies using the Company's noninvasive circulating cell-free fetal (ccff) nucleic acid SEQureDx(TM) Technology***, which enables the detection of fetal aneuploidy, including Down syndrome from maternal blood, at its Analyst Briefing in New York City. Among the data presented, ***Sequenom's test demonstrated complete concordance with clinical results (no false positives and no false negatives) in both first and second trimester samples*** (over 200 samples announced today and in excess of 400 prospective samples to-date). Sequenom executives were joined by a panel of leading scientists and clinicians to discuss these study results and updates in the development of noninvasive prenatal diagnostics.
>
> ***"These data expand upon the data we announced in June and underscore the potential for our SEQureDx Technology to transform current clinical practice for prenatal diagnostics as a primary screening tool for Trisomy 21. Furthermore, these results support the potential for our test to be used in the first trimester," said Harry Stylli, Ph.D., Sequenom's President and Chief Executive Officer.*** "In addition, our announcement earlier today regarding our acquisition of the Center for Molecular Medicine, a CLIA-certified molecular diagnostics laboratory, and our partnership with Spectrum Health and the Van Andel Research Institute, provides us with important infrastructure and commercialization control. We are delighted with our progress in bringing to market an important, noninvasive screening test for Down syndrome, as well as a broader menu of molecular diagnostic tests. These results are very promising, and we look forward to continuing the clinical development and validation progress to launch in the first half of 2009."
>
> Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development at Sequenom, presented data from blinded studies performed at Sequenom involving 219 new clinical samples collected prospectively, showing that its proprietary test for Down syndrome correctly identified 100% of all Down syndrome samples (i.e. sensitivity or detection rate), without any false-positive outcomes (i.e. specificity). The SEQureDx prototype test also demonstrated its ability to correctly identify a Down syndrome positive sample in the first trimester, confirmed by chorionic villus sampling (CVS), a current testing standard that requires the harvesting of placental tissue cells.
>
> Sequenom indicated that with the addition of new SNPs in PLAC4 and a recently discovered gene, the SEQureDx Trisomy 21 test should increase its coverage from 93% to greater than 95% in the US population. The Company has also identified novel markers for Trisomy 18 that have passed its initial selection criteria, and other chromosomes, and intends to develop these markers into new tests.

***The Company expects to continue its current development activities through the end of 2008, at which time the Company will initiate a multi-site 3,000 to 5,000-sample laboratory developed test (LDT) validation study, which is expected to be completed and submitted for publication at the time of the anticipated commercial launch in June 2009.*** To facilitate the LDT validation study, Sequenom also indicated that the company will be collaborating with new clinical partners who perform in excess of 12,000 amniocenteses and 3,000 CVS per year. In addition, Sequenom announced sponsorship of the RNA Noninvasive Aneuploidies ("RNA") study, a landmark, multi-center, prospective study involving up to 10,000 samples from first and second trimester pregnancies using the SEQureDx technology, managed and analyzed by an independent third-party.

During the Analyst Briefing, management also highlighted key upcoming milestones for the prenatal diagnostics business, including:

-- Confirm 10-week or earlier gestational age testing

-- Evaluate integration of T18 (Edward's syndrome) assay into the first generation test

-- Initiate T21 LDT clinical validation study evaluating 3,000 to 5,000 samples

-- Complete T21 testing of up to 800 additional high prevalence specimens by year-end 2008

-- Initiate "RNA" multi-center study involving 10,000 high prevalence patient samples

-- Submission of key data for publication

-- <u>Commercial launch of T21 test in first half of 2009</u>

Sequenom's analyst briefing included the following speakers and topics:

-- Harry Stylli, Ph.D., Chief Executive Officer, Sequenom Business Overview and Update

-- Charles R. Cantor, Ph.D., Chief Scientific Officer, New applications of the Sequenom Platform

-- Yury Khudyakov, Ph.D., Chief, Molecular Epidemiology and Bioinformatics Laboratory, Division of Viral Hepatitis, Centers for Disease Control and Prevention, Novel Molecular Technologies for Public Health

-- Betty Dragon, Ph.D., Senior Vice President, R&D, Noninvasive Prenatal Detection of Genetic Abnormalities Using SEQure Dx(TM) Technology

-- Daniel H. Farkas, PhD, HCLD, FACB, Executive Director, Center for Molecular Medicine, Real-world Genetic Testing: Translating Science Into Routine Clinical Tests

-- Gary S. Riordan, Vice President, Regulatory Affairs and Quality, FDA Regulatory Environment

-- Jacob A. Canick, Ph.D., Professor of Pathology and Laboratory Medicine, Brown University Medical School, Design And Implementation of a Landmark, Multicenter, Prospective Clinical Study To Validate The Safe And Accurate Detection Of Down Syndrome Using SEQure Dx(TM) Technology

-- Allan T. Bombard, M.D., FACOG, FACS, FACMG, reproductive geneticist, Chief Medical Officer, Sharp Mary Birch Hospital, Are We Facing a Revolution in Noninvasive Prenatal Genetic Diagnostics?

A recording of the webcast of the event will be available on the Company Web site at www.sequenom.com until October 7, 2008.

Sequenom's Proprietary Noninvasive Prenatal Diagnostics

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY platform.

About SEQureDx Technology

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike current standards of harvesting placental tissue cells as is required for chorionic villus, or entering the uterus to sample the amniotic fluid surrounding the baby as is performed with amniocentesis, SEQureDx Technology extracts Fetal Nucleic Acid material safely and comfortably from a simple blood specimen collected from the mother to determine the genetic status of the fetus. This

breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In December 2007, the Company, through its laboratory partner, introduced a laboratory-developed RHD genotyping test using RT-PCR in the United States. In February 2008, Sequenom announced progress with its noninvasive Trisomy 21 test based on multiple RNA fetal markers, including the PLAC4 gene as previously published by Dr. Dennis Lo, Chinese Hong Kong University."

21. On December 1, 2008, Defendants drafted and disseminated from San Diego the following false and misleading press release which touted the supposed progress and reliability of the Company's SEQureDx test:

"SAN DIEGO--(BUSINESS WIRE)--Dec. 1, 2008--Sequenom, Inc. (NASDAQ:SQNM) ***announced new data from a collaborative project with The Chinese University of Hong Kong, published this week in the Early Edition of the Proceedings of the National Academy of Sciences, that demonstrate its innovative, next-generation, noninvasive prenatal diagnostic technology accurately quantified maternal plasma DNA sequences for fetal Trisomy 21, or Down syndrome, based on samples taken from women in the first and second trimesters of pregnancy. These data are the first to suggest that this future approach, based on massively parallel genomic DNA sequencing, can be effective in women who had not previously undergone invasive procedures.***

This study used massively parallel genomic sequencing to quantify maternal plasma DNA sequences for the noninvasive prenatal detection of Down syndrome, assessing samples from 28 women in the first and second trimesters of pregnancy. All 14 Down syndrome fetuses and normal fetuses were correctly identified at these early stages.

"Current invasive methods for diagnosing Down syndrome in pregnancy have documented risks associated with such procedures. ***Our new study using massively parallel genomic DNA sequencing represents a 'next-generation' technology for noninvasive, safe testing of Down syndrome. This is the first study to show that this approach can be used for the detection of Down syndrome in both the first and second trimesters, based on a rigorously controlled clinical cohort in which the pregnant women with fetuses affected by Trisomy 21 and those with normal fetuses were matched in gestational age***, and in which most of the studied subjects had not previously undergone an invasive procedure. The latter point is important as it shows that the method would truly work in the noninvasive prenatal diagnostic scenario. This study also employs a novel data analysis algorithm which has achieved an unprecedented clear separation of the Trisomy and normal samples," stated Dennis Lo, M.D., Ph.D., co-author of the study, and Li Ka Shing, Professor of Medicine at The Chinese University of Hong Kong. "While this new approach is several years away as a commercially viable test, we believe that massively parallel genomic sequencing of DNA in maternal plasma may offer a complementary approach to the RNA

SNP allelic ratio approach that we reported last year for Trisomy 21 detection. The two approaches have performance and cost profiles which would potentially be synergistic to one another."

Sequenom licensed the exclusive rights to the massively parallel genomic DNA sequencing technology featured in this study from The Chinese University of Hong Kong in September 2008.

"Screening tests currently available for early detection of Down syndrome and other chromosomal disorders are associated with a relatively high rate of inaccuracy, which can result in an overlooked abnormality or, in the case of false positive results, unnecessary invasive and risky procedures," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. "Systems to support DNA sequencing like massively parallel genomic sequencing or shotgun sequencing are currently limited to the academic setting due to scalability limitations and high cost, therefore practical applications are several years from commercialization. We find the data reported by Dr. Lo and associates to be very compelling and, while we continue to evaluate other promising approaches, Sequenom licensed this technology several months ago because we believe massively parallel genomic sequencing is a promising approach to prenatal diagnostics that may offer a future extension to our SEQureDx(TM) prenatal diagnostics franchise. Even though this technology is years away from the clinic, ***we expect that our current RNA SNP allelic ratio technology - which is the basis for the Down syndrome test we expect to launch in June 2009 - will represent a major step forward in maternal and fetal testing***."

Current screening technology for Down syndrome includes serum marker analysis, such as the quad screen and first trimester combined screening that employs both serum marker testing and nuchal translucency. ***These approaches have detection or sensitivity rates of 80% and 85% respectively, which means between 15% and 20% of all Down syndrome-affected pregnancies will not be identified as needing further evaluation. In addition, these approaches also have false positive rates between 5% and 10%, resulting in hundreds of thousands of unnecessary, highly invasive CVS or amniocentesis procedures.*** These invasive procedures, which are used to determine whether the fetus has Down syndrome, carry a risk of miscarriage in the range of one-in-100 to one-in-300.

The study, entitled "Noninvasive prenatal diagnosis of fetal chromosomal aneuploidy by massively parallel genomic sequencing of DNA in maternal plasma" by Chiu et. al., is available online in this week's Early Edition of PNAS at www.PNAS.org.

Sequenom's Proprietary Noninvasive Prenatal Diagnostics

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as

well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based Rhesus D tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY(R) platform.

About SEQureDx Technology

Sequenom's SEQureDx Technology is a novel approach to genetic screening. Unlike current standards of harvesting placental tissue cells as is required for chorionic villus, or entering the uterus to sample the amniotic fluid surrounding the baby as is performed with amniocentesis, SEQureDx Technology extracts Fetal Nucleic Acid material safely and comfortably from a simple blood specimen collected from the mother to determine the genetic status of the fetus. This breakthrough suggests that effective screening may be accomplished in the future without the risks associated with disturbing the amniotic fluid that surrounds the baby in the uterus. In December 2007, the Company, through a laboratory partner, introduced a laboratory-developed RHD genotyping test using RT-PCR in the United States.

***Sequenom continues to make substantial progress with its noninvasive Trisomy 21 test*** based on multiple RNA fetal markers, including the PLAC4 gene as previously published by Dr. Dennis Lo. Recently, Sequenom announced initiation of a 16-month RNA-based Noninvasive Aneuploidy (RNA) study to evaluate its Trisomy 21 technology performance in up to 10,000 women with high-prevalence pregnancies within the first trimester. Led by Drs. Jacob Canick, Ph.D. and Glenn Palomaki from Women & Infants Hospital at Alpert Medical School of Brown University in Providence, Rhode Island, the study's primary goal is to document the performance (clinical sensitivity and false-positive rate) of Sequenom's Trisomy 21 technology that uses fetal RNA in maternal plasma to identify Down syndrome in early pregnancy. The study is expected to be completed post-launch of the Trisomy 21 test.

22. On January 28, 2009, Defendants drafted and disseminated a materially false press release from San Diego, again touting the significant progress with its SEQureDx test and the benefits the test would provide over competing tests on the market:

"SAN DIEGO--(BUSINESS WIRE)-- **Sequenom, Inc.** (NASDAQ:SQNM) today announced new positive data from the prospective clinical studies using the Company's noninvasive SEQureDx™ technology, enabling the detection of fetal

aneuploidy from maternal blood. The data presented today consist of 459 new, high prevalence samples from the prospective, blinded studies performed at Sequenom, bringing the total number of samples studied to 858. Based on the results from the total study samples, including samples as early as 8 weeks of pregnancy, the ***Sequenom SEQureDx RNA-based technology demonstrated a 100% positive predictive value (PPV) and a 99.9% negative predictive value (NPV). The SEQureDx technology achieved a better than 99% detection rate, with less than a 1% false positive rate. The current standard of care, screening tests, perform at less than a 99% detection rate; however, statistically, if these screening tests could perform at a 99% detection rate, their false positive rate would be in the 10% to 25% range. SEQureDx compares favorably to the current invasive procedures, such as amniocentesis.***

***"In addition to data on the RNA-based technology, the Company unveiled a breakthrough technology which further enhances Sequenom's SEQureDx technology***. This new DNA approach has demonstrated in early studies universal ethnic coverage, high sensitivity and specificity, and the ability to detect Trisomy 21 (Down syndrome), Trisomy 18 (Edwards syndrome) and Trisomy 13 (Patau syndrome) in a single test. This technology is being developed as a "reflex test" for unresolved results from the current SEQureDx Trisomy 21 technology will be available at the time of the launch of the Trisomy 21 laboratory developed test (LDT) in June 2009.

"We are very pleased with the completion of the R&D studies for our Trisomy 21 RNA-based technology," stated Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. ***"Our highly sensitive and specific Down syndrome technology will be transferred to the Sequenom Center for Molecular Medicine (SCMM) to complete the development and validation phases necessary for launch in June as an LDT. Our pioneering DNA approach is proving to be a powerful approach to detecting a wide range of aneuploidies. We are very excited by these early findings and believe it will play a key role in our prenatal diagnostics franchise as it eliminates unresolved results due to ethnic coverage and has shown sensitivity as early as eight weeks, similar to the current RNA approach. Furthermore, we believe it will have broad applicability in other areas such as cancer aneuploidies and other genetic disorders.*** This new approach and other approaches being developed by the Company are covered by existing and recently filed patents."

**Overview of Data from Screening Studies Evaluating RNA-based Trisomy 21 Technology**

Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development at Sequenom, presented data from blinded studies performed at Sequenom involving 459 new, high prevalence clinical samples collected prospectively, which brings the total number of samples studied to 858. The data from the 459 new samples show that Sequenom's proprietary technology for Down syndrome correctly identified all eight first trimester Down syndrome samples (*i.e.* sensitivity or detection rate) with no false positives and no false negatives, as confirmed by

chorionic villus sampling (CVS). Of the 15 second trimester confirmed Down syndrome samples, the Sequenom RNA-based technology detected 14 samples, with one unresolved result reflexed to the new DNA-based method. The DNA-based method accurately detected the Down syndrome. There was one false positive in the second trimester samples, which would be reflexed for confirmatory genetic testing per American College of Obstetricians and Gynecologists (ACOG) guidelines.

***"These results represent a significant advance in noninvasive prenatal screening,"*** stated Allan T. Bombard, M.D., Chief Medical Officer of Sequenom. "In light of these outstanding results, the SEQureDx RNA-based Trisomy 21 technology clearly represents a paradigm-shifting approach. I am encouraged by the single false-positive result in this study representing one tenth of one percent of the total samples tested to-date, and the detection rate is notably superior to the current standard of care, biochemical screening tests. As an ob-gyn, I am confident the simplicity of the SEQureDx approach will be invaluable to physicians and the patients they care for and will result in substantially fewer invasive procedures."

**Breakthrough DNA Approach to Detection of Trisomy 21 and Other Aneuploidies**

In addition, Dennis Lo, M.D. Ph.D., Li Ka Shing Professor of Medicine at The Chinese University of Hong Kong, presented insights in future opportunities for noninvasive prenatal diagnostics, including pioneering work in a novel DNA approach to the detection of fetal aneuploidy, an approach which Sequenom is already evaluating in R&D studies.

Dr. Dragon from Sequenom presented early findings regarding this promising technology from 359 samples. These findings showed that the DNA-based method correctly identified all 68 unresolved results reflexed from the RNA method, including one confirmed positive Trisomy 21 sample. In addition, this method correctly identified four confirmed positive Trisomy 13 samples and four confirmed positive Trisomy 18 samples.

"We believe this technology represents a breakthrough approach for detecting chromosomal aneuploidies," stated Dr. Dragon. "This method provides a universal method for detecting all chromosomal aneuploidies. The simple integration into RNA lab workflow of this MassARRAY-based technology does not impact timelines or costs. We will continue to evaluate this technology in parallel to the RNA method and plan to incorporate the DNA-based method into our launch plans."

**Future Applications in Detection of Monogenic Diseases**

During his presentation, Dr. Lo focused on the future potential for Sequenom's technology to address the unmet needs in detection of monogenic diseases. Currently, monogenic diseases, such as cystic fibrosis, B-thalassemia and sickle cell anemia, can only be definitively diagnosed prenatally through invasive

procedures following extensive carrier screening testing on both parents. In the United States, cystic fibrosis screening is recommended for all women of child bearing age (more than 10 million individuals in the U.S. are carriers of the CF mutated gene, including one in every 29 Caucasian Americans) and in certain regions of the world, B-thalassemia affects anywhere from three to 16 percent of the population.

Data presented by Dr. Lo demonstrate that when individual mutant or normal DNA sequences are counted in maternal plasma using digital PCR technology, the number of mutant genes inherited by an unborn fetus, and hence its disease status, can be determined. He further demonstrated that a 'molecular counting' strategy can be made more efficient by taking into account the length of the DNA molecules in maternal plasma, as fetal DNA molecules are known to typically be shorter than the maternally derived molecules in maternal plasma. This digital counting approach enables the noninvasive diagnosis of B-thalassemia and hemoglobin E disease from maternal plasma—forms of inherited anemias that affect millions of people worldwide. This molecular counting strategy can, in principle, be applicable to all forms of monogenic diseases, namely paternally or maternally inherited, autosomal dominant diseases and autosomal recessive diseases with any combination of parental mutations. Thus, the complete diagnosis of monogenic diseases can be achieved noninvasively. Sequenom holds exclusive rights to this breakthrough technology representing a new approach that could potentially eliminate the need for paternal testing and significantly reduce the use of invasive tests.

"This new diagnostic approach addresses a problem that has been puzzling investigators in the field of noninvasive prenatal diagnostics over the last 10 years," stated Dr. Lo, study co-author. "Digital PCR technologies have enabled us to measure the minute imbalance of mutant and normal DNA sequences in maternal plasma. This has freed us from the past restriction for monogenic disease analysis where we could only look at the paternally-inherited mutations noninvasively. This research represents a significant paradigm shift in the way we approach plasma DNA-based diagnostics, and offers substantial promise for bringing noninvasive prenatal diagnosis of monogenic diseases closer to reality."

"Sequenom is committed to developing the next generation of prenatal diagnostic tools that will provide physicians with the capabilities they need to noninvasively diagnose genetic disorders early in a woman's pregnancy," commented Dr. Stylli. ***"We believe these unique, noninvasive digital technologies have the potential to dramatically impact the prenatal diagnostic market and we look forward to advancing these innovative approaches as part of our long-term strategy to expand our prenatal diagnostics franchise."***

Sequenom's analyst briefing included the following speakers and topics:

Sequenom Business Overview and Update, Harry Stylli, Ph.D., President and Chief Executive Officer

Trisomy 21 R&D Study Results, Elizabeth Dragon, Ph.D., Senior Vice President of

Research and Development

Glimpse into the Future of Aneuploidy Screening, Elizabeth Dragon, Ph.D., Senior Vice President of Research and Development

Impact on Clinical Practice, Allan T. Bombard, M.D., Chief Medical Officer

Understanding the Regulatory Landscape, Gary Riordan, Vice President, Regulatory Affairs and Quality

Future Applications in Noninvasive Prenatal Diagnostics, Dennis Lo, M.D. Ph.D., Professor of Medicine at The Chinese University of Hong Kong

A webcast of the presentation will be available for 90 days following the event on the Company's Web site at www.sequenom.com.

**Sequenom's Proprietary Noninvasive Prenatal Diagnostics**

Sequenom's commercial opportunities in prenatal diagnostics are built upon its SEQureDx technologies and are enabled by the pioneering inventions and associated intellectual property rights that it has exclusively licensed from Isis Innovation Ltd., the technology transfer company of the University of Oxford, as well as The Chinese University of Hong Kong. Sequenom's portfolio of noninvasive prenatal diagnostic patent rights and patent applications is platform-independent, includes genetic-analysis methods using circulating cell-free fetal nucleic acids from maternal serum, plasma or whole blood, and also includes a portfolio of methylation and nucleic-acid markers. Sequenom holds exclusive rights in territories including the United States, Europe, Australia, Canada, Japan and Hong Kong. Sequenom is actively expanding its intellectual property position with new technology and new territories. Because Sequenom's license rights are platform-independent, the rights provide exclusivity (with the narrow exception in Europe for RT-PCR-based RhD tests) for development and commercialization of noninvasive prenatal screens and tests on any platform and are not limited to the Company's MassARRAY platform."

23. On February 3, 2009, Defendants prepared and disseminated a materially false and misleading press release which announced additional supposed progress on the clinical trials involving SEQureDx and continued to predict commercial lauch of the test in June 2009. The press release stated:

"SAN DIEGO--(BUSINESS WIRE)-- **Sequenom, Inc.** (NASDAQ: SQNM) today announced new data showing the discovery of DNA methylation markers for Trisomy 21 (Down syndrome), Trisomy 18 (Edwards syndrome) and Trisomy 13 (Patau syndrome) and identification of chromosome RNA-SNP markers for early detection of Trisomies 18 and 13. The data were presented on Thursday and Friday, January 29 and January 30, 2009, at the 29th annual meeting

of the Society for Maternal-Fetal Medicine (SMFM). In addition, Sequenom announced more information regarding the performance of its Down syndrome test at a separate meeting held concurrently in San Diego.

> "Sequenom is committed to reinforcing its leadership in the noninvasive prenatal arena with innovative, proprietary technologies for chromosomal disorders, and monogenic, polygenic diseases using discrete and whole genome approaches," said Harry Stylli, Ph.D., President and Chief Executive Officer of Sequenom. ***"Our discoveries regarding new DNA methylation and RNA-SNP markers for Trisomies 21, 18, 13 will help expand our future assay offerings. Also, our new, proprietary DNA-based testing method, which was presented at our analyst meeting, complements our RNA-based strategy,*** especially as a reflex for homozygote no calls. The DNA-based method has the potential to work universally for T21, T18, T13 and gender determination in a single tube."
>
> In an oral session presented at the SMFM meeting, Mathias Ehrich, M.D., Scientific Group Leader of Sequenom, highlighted the discovery of DNA methylation markers for prenatal aneuploidy testing in a presentation entitled "Discovery of DNA Methylation Markers for Prenatal Aneuploidy." The genome-wide methylation analysis identified more than 3,000 differentially methylated regions with approximately 90% confirmation; study results showed proof-of-concept for the sensitive detection of aneuploidies.
>
> In a poster session at the SMFM meeting entitled "Identification of RNA-SNP Markers for Noninvasive Prenatal Diagnosis (NIPD) of T18 and T13," an exon array was utilized to compare gene expression profiles and identify SNPs using matched placenta and maternal PBMC RNA samples. All SNP candidates were then screened using 100 human diversity genomic DNA samples of various ethnicities to measure the heterozygote rate (HR) for each SNP. SNPs with an HR of 4 percent or greater were retested using placental RNA samples. Four SNPs from one C13 gene and three C18 genes were selected for assay development based on positive placental RNA results and additional SNPs within these genes will be validated to expand population coverage for T13 and T18 screening using the RNA-based method.
>
> ***The RNA, DNA and methylation marker variations of the SEQureDx™ Technology are being developed in parallel and may be validated in the same studies. All may ultimately be commercialized and prove complementary in some or all patients.***
>
> **Additional Data from Screening Studies Evaluating RNA-based SEQureDx Trisomy 21 Technology**
>
> ***During an analyst and investor briefing held concurrently with the SMFM meeting, Sequenom presented new data evaluating its prenatal screening technology for Down syndrome.*** The data presented consisted of 459 new samples from prospective, blinded studies performed at Sequenom, bringing the total number of samples studied to 858. The test correctly identified all 22 T21

positive samples from the 459 new samples including eight first-trimester and 14 second-trimester Down syndrome samples (*i.e.* 100% sensitivity or detection rate) with one false positive and no false negatives, as confirmed by chorionic villus sampling (CVS) and amniocentesis. The DNA-based method correctly detected the one homozygous sample that the RNA-based method did not resolve (i.e., that had been deemed a "no-call").

A summary of the results for the 459 new samples including samples as early as 8 weeks of pregnancy are as follows:

Specificity of 99.7% (98.4% - 100%) and 100% sensitivity (85.1 – 100%) at a 95 % confidence interval;

***The Positive Predictive Value is 95.6% (79.0% -99.8%) and the Negative Predictive Value of 100.0% (98.9% - 100%) at a 95% confidence interval***;

The SEQureDx RNA test had a total of 85 unresolved results ("no-calls") due to homozygotes (80) and unacceptably low RNA levels (5) for a total of 18.5%. The DNA-based method analyzed 68 of the homozygote "no-calls" and all were successfully resolved;

The distribution of the 459 samples actually collected as compared to the expected rate in the U.S. population was Caucasian (282 vs. 307), Asian (101 vs. 20), African American (12 vs. 62) Hispanic (62 vs. 68) and Native American (2 vs. 3).

***"We are pleased with the progress of our research efforts and look forward to transferring the technology to our CLIA facility soon for commercial launch in June,***" said Dr. Betty Dragon, Senior Vice President Research & Development. "We are confident that our no call rate for homozygote samples will improve as the patient population increases and the ethnic distribution normalizes. We expect that in the final test, ethnic coverage will be better than 95% of the U.S. population. Identification of additional SNPs by ongoing sequencing of the relevant genes of homozygote patients, coupled with modest improvements in marker recovery, will further expand the ethnic coverage of the RNA-based test.

"Furthermore, when compared to amniocentesis or CVS, the new DNA-based method correctly identified all 68 homozygotes tested including a no-call T21 sample and a no call T18 sample. The DNA-based test shows great promise as a reflex to the RNA method or potentially as a front-line test in its own right," added Dr. Dragon.

Based on the results from the 858 total study samples, the Sequenom SEQureDx RNA-based technology demonstrated:

Specificity of 99.9% (99.2% - 100.0%) and 100% sensitivity (87.9% - 100.0%) at a 95% confidence interval;

***The Positive Predictive Value is 96.6%*** (82.8% -99.8%) ***and the Negative Predictive Value of 100.0% (99.5%*** - 100%) at a 95% confidence interval;

The SEQureDx RNA test had a total of 106 unresolved results ("no calls") due to homozygotes (94) and unacceptable RNA levels (12) or a total of 12.4%. The DNA-based method, when applied, resolved all no calls;

> ***SEQureDx is considerably more accurate than commonly employed standard-of-care screening tests, which perform at a 70%-90% detection rate (i.e., sensitivity) with a 90%-95% specificity in practice. SEQureDx even compares favorably to current invasive procedures, such as amniocentesis (which has sensitivity and specificity of approximately 99.5%).***"

24. The Company's June 4, 2008, September 23, 2008, December 1, 2008, January 28, 2009, and February 3, 2009 press releases were false and misleading when issued. The Defendants knew such statements were false due to known, existing material defects with the Company's clinical trials, including but not limited to the clinical studies being conducted in San Diego. Defendants knew that employees were mishandling the test data and results for SEQureDx, that SEQureDx did not offer significant improvements to the existing Triple and Quad tests, and that Sequenom would not be in a position to achieve commercial lauch of the test by June 2009. Nonetheless, Defendants continued to represent contrary facts to the market and to Sequenom's public shareholders.

25. In March 2009, Defendants hosted a conference entitled "Sequenom: Translating Research to Healthcare" for analysts who follow Sequenom. At the conference, defendants told the analysts that SEQureDx was on track and that everything was going well. They continued to tout the fact that the market for SEQureDx was $1.3 billion to $2 billion per year in the United States alone. At the conference, defendants presented detailed data and information concerning SEQureDX's test results. Among other things, defendants represented that SEQureDX had a significantly higher detection rate than its competitors' tests for Down syndrome during the first and second trimesters – 99%, compared to only 70% for the Second Trimerster Triple Test and 80% for the Second Trimester Quad Test. Defendants also represented to the analysts that SEQureDX had a "false positive" rate of under 1%, significantly better than the 5% rate for the Second Trimester Triple and

Quad tests. Defendants also represented that SEQureDx only had a "false negative" rate of less than 1%, compared to much higher false negative rates of 30% for the Triple Test and 20% for the Quad test.

26. Defendants knew these test results were false and misleading when they conveyed the results to the analysts in March 2009. Among other things, San Diego is one of the major sites for clinical studies conducted by Sequenom. Defendants Stylli and Hawran were two of the major presenters at the analyst conferences. Moreover, Defendants Stylli and Hawran were actively involved in all aspects of the clinical tests and personally visited the clinical sites, including the clinical site here in San Diego. They learned the adverse news belatedly disclosed by the Company on April 29, 2009 well before such date but failed to disclose it to the investing public.

27. On April 29, 2009, Sequenom shocked investors when the Company filed a press release which announced that the Company's employees had mishandled SEQureDx Down syndrome test data and results, and that the Company's press releases and public filings going back to June 4, 2008 could no longer be relied upon. The Company's press release stated:

> SAN DIEGO--(BUSINESS WIRE)--Apr. 29, 2009-- SEQUENOM, Inc. (NASDAQ: SQNM) announced today that the expected launch of its SEQureDx™ Down syndrome test is delayed, due to the discovery by company officials of employee mishandling of R&D test data and results. Accordingly the company is no longer relying on the previously announced R&D test data and results. SEQUENOM has not changed its plans to develop in parallel its RNA- and DNA-based methods for the Down syndrome test and will endeavor to have a validated test in the fourth quarter of 2009. Under the circumstances, and as supported by key clinical opinion leaders, ***the company now intends to launch the Down syndrome test upon publication in a peer-reviewed journal of the results from the on-going large, independent clinical studies,*** which are designed to be practice-changing for Down syndrome testing.
>
> ***The company's board of directors has formed a special committee of independent directors to oversee an independent investigation of the employees' activity related to the test data and results. The committee has engaged independent counsel*** to assist the committee in the conduct of the investigation.
>
> Although the company is not aware of any potentially inappropriate activity related to the reported results of its other tests under development, ***the company is***

> ***currently reviewing the data for all tests.*** As a result of this ongoing review the Rhesus D, Cystic Fibrosis and Fetalxy tests are now anticipated to begin launching in the third quarter of this year.
>
> The company believes that its Down syndrome program has suffered a temporary setback but that the SEQureDx technology is scientifically and technically sound. The company intends to take every possible action to make up lost ground. SEQUENOM believes that it has the financial resources to commercialize its test for Down syndrome and other prenatal disorders.
>
> ***Today's announcement regarding the company's SEQureDx Down syndrome R&D test data and results supersedes all previous announcements about such data and test, including its press releases dated June 4, 2008, September 23, 2008, December 1, 2008, January 28, 2009 and February 3, 2009.***

28. Sequenom also issued an Interim Report on Form 8-K with the SEC on April 29, 2009, announcing results for Q1 '09 and moving up a scheduled conference call which had been scheduled for April 30, 2009 to April 29, 2009 at 2:00 p.m. to discuss the startling news:

> "SAN DIEGO, Calif.—April 29, 2009—SEQUENOM, Inc. (NASDAQ: SQNM), today reported its financial results for the quarter ended March 31, 2009. SEQUENOM reported first quarter 2009 revenues of $8.7 million compared with revenues of $10.6 million reported for the first quarter of 2008. The decrease in revenues for the first quarter was primarily due to a decrease in system sales and services in the company's genetic analysis business. Net loss for the first quarter of 2009 was $17.5 million, or $0.29 per share, compared with $8.6 million, or $0.19 per share, for the first quarter of 2008. The increase in net loss during the first quarter of 2009 compared with the first quarter of 2008 reflects increased general and administrative expenses and expenses associated with the planned launch of various non invasive prenatal tests.
>
> System revenues were $2.4 million as compared to $3.7 million in the prior period while consumable sales rose modestly (1.3%) to $4.7 million. Gross margin was 61% for the first quarter of 2009, compared with 56% for the first quarter of 2008. The increased gross margin was attributable to higher relative sales in consumables (which have higher gross margins) as compared to lower relative system and contract research revenues (which traditionally have lower gross margins).
>
> Research and development expenses were $8.8 million for the first quarter of 2009, compared with $4.9 million for the same period of 2008. The increase in research and development expenses for the first quarter of 2009 reflected additional expenses associated with the company's investment in its molecular diagnostic technology and product development, increased clinical study costs and increased headcount-related expenses (including higher stock-based compensation expense) primarily associated with the building of the company's

infrastructure for its molecular diagnostics business. Selling, general and administrative expenses for the first quarter of 2009 were $14.3 million compared with $9.2 million for the first quarter 2008. The increase in selling, general and administrative expenses in 2009 resulted from increased headcount-related expenses related to the building of the company's diagnostics sales force, as well as legal fees associated with on-going litigation and acquisition activities. Total operating expenses for the first quarter of 2009 were $23 million, compared with $14.1 million for the first quarter of 2008.

* * *

**Conference Call**

***Due to the news announced earlier today SEQUENOM's management is rescheduling the earnings call previously scheduled for Thursday April 30 to today at 2:00pm.*** Individuals interested in participating in the conference call may do so by dialing (866) 844-2998 for domestic callers or (706) 679-9912 for international callers. Those interested in listening to the conference call live via the Internet may do so by visiting the investor relations section of the company's website at www.sequenom.com.

29. Sequenom issued another Form 8-K on April 30, 2009, which stated:

***"On April 29, 2009, we announced in a press release that the expected launch of our SEQureDx Down™ syndrome test has been delayed due to the discovery of employee mishandling of research and development ("R&D") test data and results. Accordingly, we are no longer relying on our previously announced R&D test data and results.*** We have not changed our plans to develop in parallel our RNA- and DNA-based methods for the Down syndrome test and are endeavoring to have a validated test in the fourth quarter of 2009. We now intend to launch the Down syndrome test upon publication in a peer-reviewed journal of the results from on-going, independent clinical studies.

Our board of directors has formed a special committee of independent directors to oversee an independent investigation of the employees' activity related to the test data and results. The committee has engaged independent counsel to assist the committee in the conduct of the investigation.

Although we are not aware of any potentially inappropriate activity related to the reported results of our other tests under development, we are currently reviewing the data for all tests. As a result of this ongoing review the Rhesus D, Cystic Fibrosis and Fetal*xy* tests are now anticipated to begin launching in the third quarter of 2009."

30. In response to these disclosures, shares of the Company's stock completely collapsed in after-hours trading on April 29, 2009 and upon the opening of the stock market on April 30, 2009, falling by over 80% from $14.91 to $3.23 and reaching a two-year low.

31. The reaction of analysts who follow Sequenom was harsh. "I don't believe the product will ever launch," Brean Murray Carret and Co analyst Jonathan Aschoff said. "***We seriously doubt that a timeline can be put forth when all of the RNA and DNA data***

***generated to date is now questionable***," he added.

Aschoff said although the company plans to launch the test upon publication of ongoing trial results in a peer-reviewed journal, he finds it "***almost impossible to have faith in those results given the recent developments***."

Collins Stewart analyst Keay Nakae said, with data from the company's research and development laboratory losing their value, there would be lesser interest in participating in the company's clinical studies.

***Any review will now be subject to a higher level of scrutiny and therefore will be more thorough and take longer to be signed off on before it can be published,*** Nakae added.

"***We believe that under the most optimistic scenario, the test would not be launched until 2011," he said, downgrading the stock to "sell.***" Brean Murray's Aschoff, who called the Down Syndrome test ***the company's "crown jewel***," does not think Thursday's sell off was overdone.

32. The reaction of the stock market and sophisticated market analysts demonstrates the materiality of the disclosures made by the Company on April 29, 2009. The 80% drop in Sequenom's stock price was directly caused by the material information previously withheld by the Company and the defendants.

33. Meanwhile, Defendants Stylli and Hawran refused to disclose the truth to the market during a conference call with analysts on April 29, 2009 at 2:00 p.m. P.S.T. Analysts repeatedly asked Defendants Stylli and Hawran for specifics about the four employees at Sequenom who had been suspended, but Defendants demurred, insisting that their hands were tied and they could not comment since the Company has appointed a "Special Committee" of the Board to investigate the wrongdoing. A typical exchange was as follows:

Q: Jerry Kalmatos (analyst): "My question surrounded similar questions from before. You really didn't answer them but I – most of the data, would you say, ***you used the word 'mishandled." Would you say that 'falsified' is too strong a word? Were there mistakes made scientifically on the assay part of it? Or do you think data was falsified on purpose?*** What exactly do you think happened?"

A: Harry Stylli: "I would like to answer those questions, but again, I've got to respect the other committee until in concludes its analysis."

## CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Sequenom securities common stock at any time between June 4, 2008 and April 29, 2009, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

35. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Sequenom's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sequenom or its transfer agent and may be notified of the pendency of this action by mail, using the form notice similar to that customarily used in securities class actions.

36. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained herein.

37. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

38. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether statements made by Defendants to the investing public omitted and/or misrepresented material facts about the operations and financial performance of Sequenom; and

(c) To what extent the members of the Class have sustained damages and the proper measure of damages.

39. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**<u>FRAUD-ON-THE-MARKET DOCTRINE</u>**

40. At all relevant times, the market for Sequenom common stock and securities was an efficient market for the following reasons, among others:

a. Sequenom common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient market.

b. As a regulated issuer, Sequenom filed periodic reports with the SEC.

c. Sequenom common stock and other securities were followed by securities analysis employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each report was publicly available and entered the public marketplace.

d. Sequenom regularly issued press releases which were carried by national newswires. Each release was publicly available and entered the public marketplace.

41. As a result, the market for Sequenom securities promptly digested current information with respect to Sequenom from all publicly-available sources and reflected such information in the prices of Sequenom's securities. Under these circumstances, all purchasers of Sequenom securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

42. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements leaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made. Nor was it stated with respect to any of these statements forming the basis of this complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## SCIENTER ALLEGATIONS

43. As alleged herein, the Defendants acted with scienter in that defendants knew or recklessly failed to know that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, the Defendants, by virtue of their receipt of information reflecting the true facts regarding Sequenom and its business practices, their control over and/or receipt of Sequenom's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company were active and culpable participants in the fraudulent scheme alleged herein. The Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's business, finances and operations. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Defendants.

## FIRST CAUSE OF ACTION
## COUNT I

**(Violations of Section 10(b) of The Exchange Act**
**And Rule 10b-5 Promulgated Thereunder Against All Defendants)**

44. Plaintiffs repeat and reallege each and every allegation contained above.

45. Each of the defendants: (a) knew or recklessly disregarded material adverse non-public information about Sequenom's financial results and then existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about Sequenom.

46. During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

47. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Sequenom securities during the Class period.

48. Plaintiffs and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sequenom securities. Plaintiffs and the Class would not have purchased Sequenom securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements.

## COUNT II

**(Violations of Section 20(a) of The Exchange Act Against the Selling Defendants)**

49. Plaintiffs repeat and reallege each and every allegation contained above.

50. The Defendants acted as controlling persons of Sequenom within the meaning of Section 20(a) of the Exchange Act. By reason of their senior executive and/or board positions they had the power and authority to cause Sequenom to engage in the wrongful conduct complained of herein.

51. By reason of such wrongful conduct, the Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other Class members suffered damages in connection with their purchases of Sequenom securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: April 30, 2009

FRANCIS A. BOTTINI

JOHNSON BOTTINI, LLP
FRANCIS A. BOTTINI, JR.
DEREK J. WILSON
655 West Broadway, Suite 1400
San Diego, California 92101
Telephone: 619/230-0063
Facsimile: 619/233-5535

Attorneys for Plaintiffs

# CERTIFICATION OF PROPOSED LEAD PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Ken Heilbrunn, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint with my counsel.

2. I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a lead plaintiff and representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. Attached as **Exhibit 1** are my transactions during the Class Period in the securities of Sequenom, Inc.

5. I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30 day of April, 2009.

[signature]

**KEN HEILBRUNN**

**EXHIBIT 1**

**PURCHASES AND SALES OF THE SECURITIES OF SEQUENOM, INC. BETWEEN JUNE 4, 2008 AND APRIL 29, 2009**

| DATE | PURCHASED OR SOLD? | NUMBER OF SHARES | PRICE → Avg price/share |
|---|---|---|---|
| 1/29/09 | P | 3000 | 22.40 |
| 1/29/09 | S | 1000 | 21.77 |
| 1/30/09 | P | 4800 | 22.71 |
| 1/30/09 | S | 3300 | 23.60 |
| 2/11/09 | P | 500 | 16.50 |
| 4/29/09 | P | 2000 | 5.78 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

As of today, 4/30/09, I own 6000 shares SQNM.

K. Heilbrunn

Kenneth Heilbrunn

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Bruce Jedziniak, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint with my counsel.

2. I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a lead plaintiff and representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. Attached as **Exhibit 1** are my transactions during the Class Period in the securities of Sequenom, Inc.

5. I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30 day of April, 2009.

[signature]

BRUCE JEDZINIAK

**EXHIBIT 1**

**PURCHASES AND SALES OF THE SECURITIES OF SEQUENOM, INC. BETWEEN JUNE 4, 2008 AND April 29, 2009**

| DATE | PURCHASED OR SOLD? | NUMBER OF SHARES | PRICE |
|---|---|---|---|
| 12/22/08 | Purchased | 150 | 20.267 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**CERTIFICATION OF PROPOSED LEAD PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, Mark Hamlin, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint with my counsel.

2. I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a lead plaintiff and representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. Attached as **Exhibit 1** are my transactions during the Class Period in the securities of Sequenom, Inc.

5. I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of April, 2009.

[signature]

**MARK HAMLIN**

**EXHIBIT 1**

**PURCHASES AND SALES OF THE SECURITIES OF SEQUENOM, INC. BETWEEN JUNE 4, 2008 AND April 29, 2009**

| DATE | PURCHASED OR SOLD? | NUMBER OF SHARES | PRICE |
|---|---|---|---|
| 01/30/2009 | Purchase | 125 | 2841.24 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | 1 | |
| | | | |
| | | | |
| | | | |
| | | | |

JS 44 (Rev. 12/07)

ORIGINAL

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
Kenneth Hillbrunn, Bruce Jedziniak and Mark Hamlin, Individually and On Behalf of All Others Similarly Situated

**DEFENDANTS**
Sequenom, Incorporated, Harry Stylli, and Paul Hawran

**(b)** County of Residence of First Listed Plaintiff San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant San Diego
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

'09 CV 0922 WQH CAB

FILED
APR 30 2009
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Frank J. Johnson, Francis A. Bottini, Johnson Bottini, LLP 655 W. Broadway, Suite 1400, San Diego, CA 92101 (619) 230-0063

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs.
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 463 Habeas Corpus - Alien Detainee
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)
☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
15 U.S.C. Section 78j(b) & 15 U.S.C. Section 78t(a)
Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
**DEMAND $** According to Proof
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE DOCKET NUMBER

DATE 04/30/2009
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 000353 AMOUNT 350 APPLYING IFP JUDGE MAG. JUDGE

5/1/09

Court Name: USDC California Southern
Division: 3
Receipt Number: CAS000353
Cashier ID: sramirez
Transaction Date: 05/01/2009
Payer Name: JOHNSON BOTTINI

---

CIVIL FILING FEE
For: HILLBRUNN V. SEQUENOM
Case/Party: D-CAS-3-09-CV-000922-001
Amount: $350.00

---

CHECK
Check/Money Order Num: 5648
Amt Tendered: $350.00

---

Total Due: $350.00
Total Tendered: $350.00
Change Amt: $0.00

There will be a fee of $45.00
charged for any returned check.